UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 07-63-P-S |
| | ) | |
| JUAN DOMINGUEZ DELACRUZ, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Juan Dominguez Delacruz, charged with two counts of conspiring to distribute and possess with intent to distribute a substance containing heroin and one count of aiding and abetting the distribution of a substance containing heroin the use of which resulted in a death, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846, Superseding Indictment (Docket No. 35) at 1-2, moves to suppress evidence that four witnesses identified him from a single photograph presented to them by Steven A. Hamel, a narcotics investigator for the Kittery Police Department, and to prohibit those witnesses from identifying the defendant at trial. Before the hearing on the motion began, counsel for the government and for the defendant agreed that the question whether any particular witness would be allowed to identify the defendant at trial was properly reserved for the trial judge. An evidentiary hearing was held before me on January 31, 2008 at which the defendant appeared with counsel. Two exhibits were offered by the government and admitted without objection. Hamel was the only witness who testified. I now recommend that the following findings of fact be adopted and that the motion be denied.

1

## I. Proposed Findings of Fact

In June 2004 Hamel, who now has 21 years of experience, began investigating the death of Bethany Fritz. In December 2004 he arrested Scott Fisher for supplying the heroin that caused her death. Fisher agreed to cooperate following his arrest. Fisher told Hamel that he got the heroin from a man he knew as Louie in Haverhill, Massachusetts and that he had been getting heroin from Louie from early spring 2004 through the time of his arrest. During that time he made between 30 and 50 trips to buy heroin from Louie. He went to the Haverhill area daily, sometimes twice a day, to pick up heroin from Louie with the exception of two one- or two-week periods when he was in rehab. Fisher said that he had no other source of heroin.

Fisher related that when he called Louie in Massachusetts, a hispanic male would answer the telephone. He would make arrangements with this man to pick up the amount of heroin he wanted. He always met with the man who handed him the heroin, whom he believed to be Louie, on a back road between Exits 50 and 52 of Interstate 495 in the Long Pond area of Haverhill, Massachusetts. The two drivers would flash their headlights at each other and then stop in the middle of the road and transact business between the two driver's side windows, with Fisher handing over the money and then receiving the heroin from a hispanic male whom he described as having dark hair and being medium to heavyset. On two occasions a different man brought the heroin but otherwise it was always the same person.

On December 14, 2005 Hamel went to the Cumberland County Jail and showed Fisher a photograph, Government Exhibit 1, which he had obtained from the Haverhill police department and which Hamel thought was a photograph of Louie. Hamel asked Fisher if he recognized the person in the photograph. Fisher immediately said, "Yes, that is Louie," with no hesitation at all.

On September 14, 2006 Deke Fennell was arrested and agreed to cooperate in the ongoing investigation. Fisher conducted a motor vehicle stop that day in response to information that the investigators had been given and found a substantial amount of heroin in Fennell's possession. Fennel said that he got the heroin from Louie in Haverhill, Massachusetts. He said that he had been introduced to Louie in the spring of 2006 by Shawn Bolderbook, that he went to Haverhill with Bolderbook five to ten times and thereafter was able to deal with Louie directly. Fennell said that he had made approximately 80 trips on his own to meet with the man whom he knew as Louie. Each time, he would call Louie and tell him how much heroin he wanted. He then drove to the same Interstate 495 corridor, calling Louie when he was ten minutes away from the area and arranging the specific place near Long Pond at which to meet. He and the driver of the other vehicle would flash their headlights and then stop in the middle of the road where Fennell would hand over the money through his driver's side window and the other vehicle's driver's side window and receive heroin in return. Fennell said that the delivery driver was always the same hispanic male.

In the months preceding September 14, 2006, Fennell said, he was making trips almost daily. On September 14, 2006 Hamel showed Fennell Government Exhibit 1 at the Kittery, Maine police station and asked Fennell if he recognized the person in the photograph. Fennell said, without any hesitation, that the person in the photograph was "King Louie," the same person who had been delivering heroin to him and whom he believed to be the person with whom he spoke on the telephone. Fennell made two controlled purchases of heroin from Louie after his arrest, in September and November 2006, using marked money, wearing a transmitter and under constant surveillance by investigators. Both of these buys followed the procedure Fisher and Fennell had described. Hamel listened in on the telephone calls, which were recorded. In both cases Fennell returned to a prearranged location with the heroin and was searched, as was his vehicle. The heroin given to

Fennell in the first transaction was a "bundle" short. Hamel had Fennell call Louie to report this. Louie said that he would include an extra bundle on the next buy and did so.

On February 1, 2007 Jason Burleigh, against whom a charge of cocaine distribution was pending, agreed to cooperate with Hamel's investigation. Hamel approached Burleigh because he knew that Burleigh was also involved in the heroin ring. Burleigh related that over the past month he had made five to seven trips to meet Louie. He said that he was making the trips for Bolderbook, who had introduced him to Louie. He said that Bolderbook made telephone contact with Louie and then would give Burleigh money and send him to the same Interstate 495 corridor, where he would call Bolderbook, who then would call Louie and then call Burleigh back with directions to the meeting place in the Long Pond area, where the procedure described by Fennell and Fisher was followed. The same person always brought him the heroin, Burleigh said, and when Hamel showed Burleigh Government Exhibit 1 and asked him if he recognized the person in the photograph, Burleigh said, "That's Louie." Burleigh had made his last trip for Bolderbook just a few days before February 1, 2007.

Early in March 2007 Jamie Houde agreed to cooperate with Hamel's investigation. He came to the Kittery police department to talk to Hamel. He said that he had been introduced to heroin through Bolderbook and had made 20 trips over the past two months to purchase heroin from Louie. He said that at first Bolderbook would call Louie and then give money to Houde who would drive to the same Interstate 495 corridor, where he would call Bolderbook and be directed to a road in the Long Pond area where the same procedure described by the other witnesses would ensue. Houde said that his last trip to get heroin from Louie had been made on March 8, 2007. On March 14, 2007[1]

---

[1] In his report about the witnesses' identification of the photograph, Hamel erroneously gave this date as March 14, 2006.

Hamel showed Houde Government Exhibit 1 and asked him if he recognized the person in the photograph. Houde immediately said, without hesitation, that the person in the photograph was Louie.

Government Exhibit 2 is an enlargement of the photograph portion of Government Exhibit 1. It contains nothing else. The person in the photograph is the defendant. Government Exhibit 1, a Haverhill, Massachusetts Police Department booking sheet, bears the name "Juan Dominguez Delacruz." It nowhere contains the name "Louie" or any name resembling that. None of the four witnesses indicated that they had had any difficulty seeing the person who had delivered the heroin to them.

Fennell introduced Hamel to Louie over the telephone and Hamel began ordering heroin from Louie in the spring of 2007. Hamel did not meet Louie in person. From the spring of 2007 through the summer of 2007 an undercover agent was able to obtain heroin from Louie as a result of Hamel's orders. Agent Rick Poirier of the Cross Borders Investigation ("CBI") unit[2] based in Lowell, Massachusetts made the purchases on the same day that Hamel made the calls. Louie once changed the location of the transfer to Lawrence, Massachusetts but otherwise Poirier obtained the heroin by the same procedure described by Fisher, Fennell, Burleigh and Houde. Poirier was shown Government Exhibit 1 before and after making his purchases and said that the person delivering the heroin was the person in the photograph.

On June 26. 2007 Hamel called Louie, ostensibly to make another purchase. Hamel had an arrest warrant for Louie from this court. He and others from the CBI arrested the defendant that day. The warrant was for Louie but was in the name of the defendant, Juan Dominguez Delacruz, whom the officers then believed to be Louie. After the defendant had been arrested and put in handcuffs,

---

[2] The Cross Borders Investigation unit is a Drug Enforcement Agency task force made up of local police and sheriff's deputies assigned to it for drug investigations. It was assisting Hamel in this investigation.

5

Hamel's telephone rang and he recognized the call as being from Louie. He then realized that the defendant was not Louie but just the person who delivered the heroin.

None of Hamel's reports of the debriefing of each of the four witnesses mentions showing them the single photograph of the defendant. He did not ask any of the witnesses if they were using heroin or were high each time they saw the person whom they identified as the defendant. Fisher was using heroin in 2004. All four witnesses described the person who delivered the heroin as a dark-haired hispanic male who was medium- to heavy-set. None of the witnesses told Hamel that the defendant's voice was the same one they heard when talking with Louie on the telephone.

## Discussion

In *United States v. Henderson*, 320 F.3d 92 (1st Cir. 2003), the First Circuit addressed a challenge to two witnesses' identification of the defendant after they had been shown a single booking photograph of the defendant. One was asked, "Who is this?" *Id*. at 99. The other was asked if it was the defendant. *Id*. Quoting extensively from the Supreme Court's opinion in *Simmons v. United States*, 390 U.S. 377 (1968), the First Circuit, noting that it had previously reminded courts to "be mindful that it is only in extraordinary cases that identification evidence should be withheld from the jury," held as follows:

> We use a two-step test to make this determination. The first step is to decide whether there was an impermissibly suggestive procedure. . . . Our next step is to decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure.

*Id*. at 99-100 (citations and internal punctuation omitted). The First Circuit then adopted the five-factor test set forth by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1972), that is to be used in resolving the issue at the second step:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by

6

>the witness at the confrontation; (5) the length of time between the crime and the confrontation.

*Id*. at 100. In *Henderson*, the government conceded that the photographic procedure was impermissibly suggestive. *Id*. In this case, the government does not. Government's Opposition to Defendant's Motion to Suppress (Docket No. 34) at 5-6.

In *United States v. Castro*, 243 F.Supp.2d 565 (W.D.Va. 2003), the court dealt at some length with the question whether a single-photograph identification was impermissibly suggestive. In that case, two individuals who had been arrested in possession of multiple pounds of methamphetamine told federal and state agents in the months after the arrest that their source of supply was a man from Chicago know as "La Roca" or "Roque." *Id*. at 567. Approximately ten months after the arrest, they were each shown a single photograph of the defendant. *Id*. The officer who showed them the photograph asked them whether the individual depicted was involved with narcotics. *Id*. One unequivocally identified the person in the photograph as "Roque." *Id*. The other said that it could be a photograph of "Roque," but she was not sure. *Id*.

The first witness told the agents that he had known Roque since approximately age fourteen and had worked for him for about six years. *Id*. at 568. He provided a general physical description of Roque, including his age and build, and some general information about his drug operation. *Id*. The officer testified that he was conversing with the witness about other aspects of the case, then showed him the photograph and asked if the man in the photograph had any involvement with the case, or with narcotics. *Id*. at 569. The witness never hesitated in identifying the photograph as being that of Roque. *Id*.

The court first noted that

>the concern that a single-photograph identification is unduly suggestive and may result in a misidentification stems from the fact that usually, what is at

7

>  stake is an identification of a complete stranger whom the witness encountered under circumstances of emergency or emotional distress.

*Id*. at 570 (citation and internal quotation marks omitted). Then the court held that the single-photograph identification by the first witness was not impermissibly suggestive for the following reasons:

> Nothing about the photograph itself, and nothing about the way in which the photograph was presented to [the witness] suggested that [the officer] sought an identification of Roque. [The witness] identified the defendant's photograph during an[] incidental conversation about other aspects of the case with [the officer]. The uncontroverted testimony was that [the officer] did not in any way suggest or ask [the witness] whether the photograph was of Roque. The evidence shows that [the officer] only inquired as to whether the man in the photograph was involved with narcotics, not whether he was Roque. [T]he instant identification did not come at a time when the eyewitness was expected to, or was attempting to, identify any particular person. . . .  Finally, . . . [the witness] was identifying what amounts to a business associate, and not an attacker or a stranger with whom he had only limited interaction during an emotionally stressful event.

*Id*. at 570-71. *See also United States v. Cline*, 2007 WL 2510612 (D.S.C. Aug. 30, 2007), at *3. The same is true of the witnesses in this case, also including the fact that each of these witnesses, like the witness in *Castro*, had already given the government several methods of locating Louie. *Castro*, 243 F.Supp.2d at 571.

Each witness's circumstances must be considered individually. *Henderson*, 320 F.3d at 99. I note that Fisher identified the photograph one year after he was arrested, but the passage of time is one of the reliability factors and does not affect whether the circumstances of the identification were impermissibly suggestive. On that point, Fisher's identification does not differ in any important way from the identification of Roque in *Castro*. He was identifying a business associate whom he had seen at least 30 and possibly 50 times, he was not asked whether the man in the photograph was Louie, he was not expected to or attempting to identify any particular person at the time and nothing else in the evidence suggests that Hamel conveyed to Fisher that he sought an identification of Louie.

8

Fennell also identified a business associate, one whom he had seen at least 80 times, including on the day that he made the identification. Hamel asked him whether he recognized the person in the photograph, not whether the person in the photograph was Louie, and, from all that appears, did not convey to Fennell that he was expected to identify Louie from the photograph. The use of a single photograph with Fennell was not impermissibly suggestive.

Burleigh had made five to seven trips to obtain heroin from the man he thought was Louie. He had made such a trip a few days before Hamel showed him the photograph and asked him if he recognized the person in the photograph. Again, nothing in the evidence demonstrates a reasonable possibility that the use of a single photograph with Burleigh was impermissibly suggestive.

Houde had made 20 trips to obtain heroin from Louie over the two months immediately preceding the day when Hamel showed him the photograph and asked if he recognized the person depicted. Houde immediately identified the person as Louie, without hesitation. The evidence does not allow the drawing of any conclusion other than that the use of a single photograph with Houde was not impermissibly suggestive.

Because the use of the single photograph with each of the four witnesses was not impermissibly suggestive, there is no need to consider the *Biggers* factors, although I note that each of those factors, in varying degrees, favors admissibility of the single-photo identifications.

## Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and that the motion to suppress be **DENIED**.

### *NOTICE*

***A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for***

Case 2:07-cr-00063-GZS   Document 55   Filed 02/04/08   Page 10 of 10   PageID #: 94

*which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 4th day of February, 2008.

>/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge